IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL ACTION NO. |
| | ) | 2:05cr19-MHT |
| ARTEMIS JAMAL TERRY | ) | (WO) |

OPINION

This criminal case involves the tragic intersection of a state foster care system and the criminal justice system.  It also raises the question of what constitutes a "reasonable" sentence, which has taken on added significance since the Supreme Court decided United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005), and effectively made the United States Sentencing Guidelines advisory, United States v. Crawford, 407 F.3d 1174, 1178-79 (11th Cir. 2005).  This opinion explains why a sentence outside the Guideline range (a 'variance') is reasonable and necessary here.

## I. BACKGROUND

### A. Offense Background

On August 24, 2004, defendant Artemis Jamal Terry, who is now 21 years old, broke into a house and stole a shotgun, conduct which constitutes burglary under state law.  Responding to a tip reporting suspicious activity at the house, police arrived at the scene and interrupted the burglary.  Terry pointed the gun, which was loaded, at a police officer who was standing approximately eight feet away, and then fled.  While fleeing, he also pointed the gun at a neighbor.  Terry was apprehended later that day.

### B. Procedural Background

Terry, who had previously been convicted in state court of possessing a controlled substance with intent to distribute, was charged with and pled guilty to being a felon in possession of firearm in violation of 18 U.S.C.

2

§ 922(g)(1).[1]  Prior to sentencing, the Probation Office prepared a presentence investigation report (PSR).

Probation recommended three enhancements of the base-offense level of 20, <u>see</u> U.S.S.G. § 2K2.1(a)(4)(A) (setting a base-offense level of 20 for certain felon-in-possession-of-a-firearm convictions).  First, Probation applied a two-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(4) because the gun Terry possessed was stolen. Probation also applied a four-level enhancement pursuant to U.S.S.G. § 2K2.1(b)(5) because Terry possessed the gun while burglarizing the house.  Finally, Probation applied a two-level enhancement pursuant to U.S.S.G. § 3C1.2 because Terry recklessly endangered the police officer and neighbor when he pointed the gun at them.  Probation also recommended a three-level reduction, pursuant to

---

        1.  Based on this conduct, Terry also was charged and convicted in state court of reckless endangerment, a misdemeanor, for pointing the gun at the neighbor.  A burglary charge is still pending against him in state court as well.

U.S.S.G. § 3E1.1(a) & (b), for acceptance of responsibility.

Probation calculated Terry's criminal history score as follows: two points for an assault that occurred when he was ten-years old; two points for an escape that occurred when he was 15-years old; three points for a drug-distribution offense that occurred when he was 18-years old; two points, pursuant to U.S.S.G. § 4A1.1(d), because the instant offense occurred while he was on probation; and one point, pursuant to U.S.S.G. § 4A1.1(e), because the instant offense occurred less than two years after he had been released from a sentence of imprisonment.

Thus, Terry's offense level was 25 and his criminal history score was ten, which is Category V. The resulting sentencing range was 100 to 120 months.[2] Terry filed six objections to the PSR. First, he objected to

_____

2. The statutory maximum for a § 922(g)(1) conviction is ten years. Thus, the Guideline range of 100 to 125 months was capped at 120 months by the statutory maximum.

4

any enhancement of his sentence based on judicial fact finding supported only by a preponderance of the evidence. Second, he objected to the imposition of the § 2K2.1(b)(4) enhancement as impermissible double counting. Third, he questioned the imposition of the § 2K2.1(b)(5) enhancement when the gun was acquired during the burglary. Fourth, he objected to the inclusion of the assault, which had occurred when he was ten-years old, in his criminal history score. Fifth, he objected to the inclusion in his PSR of information about juvenile charges that had been dismissed. Sixth, he objected to the imposition of three criminal history points pursuant to U.S.S.G. § 4A1.1(d) & (e) as impermissible double counting. Noting a circuit split on the third objection, the court ordered supplemental briefing.

Finally, Terry filed a motion for downward departure, claiming that his criminal history score was over-represented; he also asked the court to impose a sentence

outside the Guideline range, that is, a variance, which is possible now that <u>Booker</u> has made the Guidelines advisory.

At a sentencing hearing on December 14, 2005, the court overruled Terry's first, second, fifth, and sixth objections to the PSR, sustained his fourth objection, and reserved judgment on the third objection, the motion for downward departure, and his request for a variance.

In separate orders dated March 27 and March 28, 2006, the court denied Terry's motion for downward departure, <u>United States v. Terry</u>, ___ F.Supp.2d ___, 2006 WL 768854 (M.D. Ala.2006), and overruled his third objection to the PSR.  <u>United States v. Terry</u>, ___ F.Supp.2d ___, 2006 WL 784769 (M.D. Ala.2006).  As a result, his Guideline sentencing range is 84 to 105 months.

When the sentencing hearing resumed on April 12, 2006, the court granted Terry's request for a variance and imposed a sentence of 60 months, 36 of which are to run consecutive to any state sentence he receives for

this conduct.   The court promised a written opinion
explaining the reasons for imposing a variance in greater
detail.   This is that promised opinion.


## C. Personal Background

Terry's criminal conduct did not occur in a vacuum.
He was born into dysfunction and poverty in Clanton,
Alabama in 1984.   His mother was addicted to crack, was
involved in the drug trade, and was in prison for much of
his childhood; he did not know his father.   Terry was
raised by his maternal grandmother, who was an alcoholic
and unable to provide adequate care for him.   He
sometimes went without food because his family lacked
money.   His childhood home was known in the community as
a drug house, and drugs were frequently sold out of the
home.   In fact, when he was a teenager, family members
gave him small quantities of drugs, which he sold so he
could have spending money.

When Terry was ten-years old, he was involved in a fight during which he cut another child with a broken bottle.  Concerns relating to his grandmother's ability to provide a structured home environment, the presence of drugs in the home, and possible physical abuse were brought to the attention of the State of Alabama Department of Human Resources (DHR) during the course of the investigation.  He was adjudicated delinquent on a count of assault and sentenced to probation.  He was made a ward of the state later that year after allegedly breaking a neighbor's window.  For the rest of his childhood, Terry bounced from placement to placement as a ward of the State.[3]

---

3.  The state of Terry's juvenile and dependency records is confused and incomplete.  Indeed, it is difficult to reconstruct his placement history with certainty because several summaries of his life history prepared by psychologists, probation officers, or social workers conflict regarding the timing of some placements, and the reasons his placements changed.  See Exhibits attached to defendant's supplemental brief (Doc. No. 61), psychiatric report (Doc. No. 64), and evidentiary submission (Doc. No. 65).

Terry had at least 12 placements between ages ten and 18, excluding several brief stints where he returned to live with his grandmother.   The longest of these placements appears to have lasted nine months.   He admits that he often acted out as a youth in order to receive attention from the probation officers and social workers who were in charge of his care.   He claims he only received attention from them only when he got in trouble.

Terry's placements were primarily in group homes for troubled youths, though he also was held by the Alabama Department of Youth Services in detention settings on at least three occasions.   He also had three foster home placements, though two such placements were acknowledged as temporary fixes until DHR could find another placement for him.

In 2000, when Terry was 15-years old, DHR filed a petition with the juvenile court to transfer him from a foster-care setting to a detention setting because the foster setting was unable to cope with his behavioral

problems (which were disruptive, though not criminal in nature).  This referral occurred within one month of his placement in the group home, which was at least his fifth placement in as many years.[4]

In a letter to the juvenile court judge, Terry's social worker explained that Terry was disruptive in school, ran away from his placement, and kicked a hole in a wall after being told he could not return home.  One example of his 'un-manageability' given in the letter occurred when he returned to the group home after a failed attempt to run away; he had lost his school uniform and refused to go to school out of uniform.  The letter also referenced an incident where Terry had refused to watch a health video on 'crack babies.'

On the day of the hearing before the juvenile court, Terry ran away from the courthouse and went to his grandmother's house.  She immediately returned him to the

---

4. This incident is documented in the exhibits attached to defendant's supplemental brief (Doc. No. 61).

10

courthouse, but he was nonetheless charged with and convicted of the state felony of escape.

At a hearing held on Terry's eighteenth birthday, the juvenile court granted DHR's motion to terminate its responsibility for him.  There is no indication that he had any support services available to him when he "aged out" of the State's dependency system or any independent living transition plan to help him become self-sufficient as an adult.

After aging out of the dependency system, Terry returned to his grandmother's house in Clanton and was arrested two months later on drug charges.  He sold 0.14 grams of cocaine to a confidential informant and was sentenced to 15 years, split between two-years imprisonment and the remainder on probation.

On August 12, 2004, Terry was released from prison and returned to his grandmother's house.  On August 23, 2004, he allegedly committed an armed robbery by stealing

a woman's purse at knife-point.  On August 24, 2004, he committed the felon-in-possession offense at issue here.

### D. Terry's Psychological Profile

Terry has received several mental-health evaluations throughout his state placements, but there is no evidence of ongoing therapy.  The various mental health evaluations contained in his file consistently reflect that he had adjustment disorder or oppositional defiant disorder.  They also reflect that he has anywhere from borderline to average intelligence.

Following the first sentencing hearing, the court requested that Terry be evaluated. He met with Dr. Catherine Boyer, a clinical and forensic psychologist.[5] Dr. Boyer administered the Wechsler Adult Intelligence Scale, Third Edition, which reflected that Terry can succeed educationally, though he suffers from some

---

5.  See Psychiatric report (Doc. No. 64).

12

deficits likely attributable to his early environment. He has strengths in math and visual-spatial reasoning.

Dr. Boyer also reviewed Terry's records and interviewed him. She found that DHR was unable to provide him with a placement that could address his emotional and behavioral needs during his pre-teen years. Consequently, he endured multiple placements of varying lengths, which limited his ability to achieve stability and attain emotional connection. Whenever he exhibited problematic behaviors, the typical result was yet another placement change, depriving him of familiarity and consistency. The changes exacerbated his distress and anger and fueled his behavioral problems. Dr. Boyer also found that Terry began using marijuana daily at age 13 to help take his worrying and pain away.

Dr. Boyer's report concluded that Terry has done well for short times when he has adequate structure. It held out hope that with a positive male role model, further educational and job skill development, and substance

13

abuse treatment, Terry could be rehabilitated and learn to manage his behavior and function independently.

## II. SENTENCING POST-<u>BOOKER</u>

Although district courts are no longer bound to follow the Sentencing Guidelines after <u>Booker</u>, they still must consult the Guidelines and take them into account when sentencing. <u>Crawford</u>, 407 F.3d at 1178; <u>see also</u> 18 U.S.C. § 3553(a)(4) & (5). After calculating the correct Guideline range, the court may impose a more severe or more lenient sentence, as long as the sentence is reasonable. <u>Crawford</u>, 407 F.3d at 1179. The factors set forth in 18 U.S.C. § 3553(a) continue to guide sentencing and will necessarily inform whether a sentence is reasonable.[6] <u>Booker</u>, 543 U.S. at ___, 125 S. Ct. at 766.

---

6. Section 3553(a) requires courts to consider: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to punish the offender, protect the public from the defendant, rehabilitate the defendant, and deter others; (4) the kinds of sentences available; (5) the sentencing range established by the Sentencing Guidelines; (6) any pertinent policy

14

The primary goal of sentencing is to impose a sentence
that is sufficient, but not greater than necessary, to
punish the offender, protect the public from further
crimes by the defendant, rehabilitate the defendant, and
deter other people from committing similar crimes.   18
U.S.C. § 3553(a).

Thus, the sentencing court's obligation under the
current sentencing regime may be summarized as follows:
review the PSR for accuracy and rule on any objections;
calculate the total-offense level and criminal-history
score; rule on any possible upward or downward
departures; determine the final Guideline range; and,
finally, with the appropriate Guideline range in mind,
determine and impose a sentence that serves the purposes
set forth in § 3553(a).

———————————

statements issued by the Sentencing Commission; (7) the
need to avoid unwarranted sentence disparities among
defendants with similar records who have been found
guilty of similar conduct; and (8) the need for
restitution.  18 U.S.C. § 3553(a).

### III. A REASONABLE SENTENCE

A Guideline sentence for Terry would be somewhere from 84 to 105 months.  At the second sentencing hearing, the court concluded that an 84-month sentence was greater than necessary to achieve the purposes set forth in § 3553(a), and imposed a 60-month sentence along with the maximum three years of supervised release.[7]  The court will now explain in greater detail how the factors set forth in § 3553(a) informed its decision.[8]  The challenge in this case was to balance the seriousness of this crime

---

7.  This case presented numerous issues relating to the proper calculation of the Guideline sentence, and the court has considered the Guideline sentencing ranges that Terry would have faced had the objections to the PSR come out differently.  The court concludes that, under any of these possible permutations, the court still would impose a 60-month sentence on Terry based on the analysis of § 3553(a) that follows.

8.  Although sentencing courts are not required to consider every factor set forth in § 3553(a) when announcing a sentence, United States v. Scott, 426 F.3d 1324, 1329 (11th Cir. 2005), when a court imposes a sentence outside the Guidelines, as the court has done here, it is helpful to provide insight into how the sentencing factors played into that decision, United States v. Robles, 408 F.3d 1324, 1328 (11th Cir. 2005).

16

with Terry's background, in which the State of Alabama's child-dependency, juvenile-delinquency, and criminal-justice systems shaped his development and set him up for failure.

## A. Offense Characteristics

This is a very serious offense.  Terry committed a burglary, which is a crime of violence, and he was armed during the latter part of the burglary.  The situation presented a real possibility for violence and the outcome could have been much worse.  During the course of the burglary, he pointed a gun, point blank, at a police officer, and while fleeing pointed the gun at an innocent bystander.  But for the "luck" of the circumstances, Terry could now be dead or facing the death penalty for two killings, one of them being of a police officer. Moreover, the police officer and bystander must live with the memory of being threatened with a deadly weapon, a factor which cannot be discounted.

17

B. Defendant's History and Character[9]

Like many defendants that come before federal judges for sentencing, Terry comes from a disadvantaged background.  He grew up surrounded by poverty, crime, and drugs; he has obtained only the equivalent of an eighth grade education; and his life has been very unstable, lacking structure as a child and bouncing from placement to placement as a teen.  In sum, he lacks a support network and the resources and skills necessary to help him successfully transition to independent adulthood.

---

9.  Post-Booker this factor has taken on new importance and depth.  See United States v. Ranum, 353 F.Supp.2d 984, 985-86 (E.D. Wisc. 2005) (Adelman, J.).  Booker requires courts to consider all of the § 3553(a) factors, including the history and characteristics of the defendant, but the Guidelines prevent courts from considering defendants' age, vocational training or skill, mental and emotional condition, lack of guidance as a youth, and other factors that are clearly relevant to their history and character.  Id. at 986.

Because the Guidelines are now advisory, courts must consider the full history and characteristics of the defendant. Nonetheless, pursuant to § 3553(a)(5), courts must still give weight to the Sentencing Commission's policy statements regarding which aspects of a defendant's history to consider.

18

The government argued that courts generally do not impose a more lenient sentence because of a defendant's troubled background.  The court agrees with the premise of the government's position--that family support and upbringing (whether good or bad) generally will not serve as the basis for altering a sentence--but this case presents a distinct inquiry for two reasons.

First, the State of Alabama removed Terry from the custody of his parents and family and placed him in the state's dependency system around the age of ten.  When the State takes over a child's parenting, which is a drastic step, see Meyer v. Nebraska, 262 U.S. 390 (1923) (holding that a parent's right to control a child's upbringing is a fundamental liberty interest under the Fourteenth Amendment), it is not unreasonable to expect the State to do a decent job of it.  However, the State of Alabama did not: The record here shows a troubling

19

degree of negligence, or even wantonness, with respect to Terry's upbringing.[10]

The State failed to provide Terry with a basic education after it gained custody over him.  Terry had been held back in third grade, so he should have been in fourth grade when he came into state custody around age ten.  Over the next eight years, he advanced only three grade levels and left state custody at age 18 having completed only the seventh grade.  The State was acting as Terry's parent, yet it failed to ensure that he advanced in school.  There is no indication that Terry chose to drop out of school; he appears simply to have been moved from placement to placement so often that he

_____

10. Admittedly, this factor alone might be insufficient to warrant a variance from the Guidelines. Many defendants in federal court were once wards of the state and many were failed in the same way Terry was.  To vary from the Guidelines based on this fact alone would lead to disparate sentences based solely on whether one was involved in the foster system.  Terry's case is, however, an extreme case among children involved in the foster-care system because, as explained in great detail below, the State actively set Terry up for failure and then punished him extremely harshly when he failed.

could not complete grades.   Moreover, nothing in his history suggests that he was incapable of succeeding in school.   In fact, his file contains numerous evaluations that reflect his capability as a student and his particular aptitude for math.[11]

The record also reflects that the State failed to nurture Terry throughout his dependency.   After he was removed from his family and, as he was bounced from placement to placement, he never had an opportunity to

---

11. The State's failure to ensure a proper education has very real consequences.   Approximately 16 % of all young men ages 18-24 without a high school degree or GED are incarcerated or on parole at any one time; among black males, such as Terry, the number is 30 %.   Michael Wald & Tia Martinez, Connected by 25: Improving the Life Chances of the Country's Most Vulnerable 14-24 Year Olds, William and Flora Hewlitt Foundation Working Paper, at 7 (November 2003), available at http://www.hewlett.org/NR/rdonlyres/60C17B69-8A76-4F99-BB3B-842551E4E5A19/0/FinalVersionofDisconnectedYouthPaper.pdf.   This outcome can likely be traced in large part to the fact that those without high school diplomas are at high risk of long-term unemployment.   One study found that half of young people who lacked a high school diploma were disconnected from the labor force for three or more years between their 18th and 25th birthdays.   Id. at 6.   These consequences are manifest in Terry's life.

develop a relationship with an adult who could serve as a positive model. Terry's file reflects that he mostly stayed out of trouble once he found himself in a stable environment, but behavioral problems consistently emerged following transfers. Nonetheless, he was often moved from a placement simply because it was inconvenient for the placement to continue to care for him.

For example, on two separate occasions, he was removed from a supportive foster-care placement, once because the foster parent had space for him only temporarily and once because that foster parent was no longer taking any foster placements. Terry's emotional and social development was certainly not helped by being placed in nurturing environments in which he briefly thrived, only to be removed by circumstances outside his control.

Likewise, in the 2000 letter of referral, Terry's social worker requested that he be placed in the custody of the Alabama Department of Youth Services because his

22

group home placement could not manage his disruptive behavior and because he had run away from the placement. Among the examples of the former, the letter indicated that he had refused to go to school because he did not have a school uniform and because he refused to watch a movie on crack babies. As defense counsel observed at the first sentencing hearing, any parent should know how to deal with the first situation (find him another uniform) and the second is hardly surprising given that Terry's mother had been addicted to crack. Yet he was referred to judicial proceedings and recommended for placement in the Youth Services Department, the juvenile delinquency agency for the State.

Similarly, when the 15-year old Terry ran from juvenile court to his grandmother's house and was immediately returned him to court, he was charged with the felony of escape. Even a cursory review of Terry's record reveals that his greatest desire was to return to his family, whom he loved, and that he never fully

understood why the State would not let him return to live with his grandmother.  Yet rather than making efforts to address his underlying needs at his foster placement, the State made him a felon.

Thus emerges a pattern in Terry's life of the State's decision to criminalize, rather than discipline, the acting out of a troubled child.  This response is especially troubling because the State was supposedly acting as Terry's parent.  The State did not just fail to nurture Terry, it actively thwarted his development through the criminalization of behavior that required parental, not judicial, intervention.

Nonetheless, the government argued that Terry, not the State, leveled a shotgun at a police officer during a burglary and sold drugs after aging out of the foster-care system; only Terry decided to act as he did.  While true, this argument misapprehends the process of sentencing, which is not concerned exclusively with the

**24**

defendant's conduct; sentencing is, in part, about the defendant's criminal history.

This highlights the second reason why this case falls outside the general rule that a defendant's family support and background should not alter the sentence imposed: All of Terry's criminal history points can be traced to decisions by the State to punish Terry criminally when he was a ward of the State or just after he aged out of the foster-care system. Acting as Terry's "parent," the State elected to criminalize his behavioral problems and thereby encumbered him in his future life in a way no parent, however bad, could ever do. Parents cannot give their children criminal history points; only the State can.

Simply put, Terry has such a high criminal-history score because the State of Alabama repeatedly and inexplicably punished him criminally for his conduct. The State prosecuted Terry for assault for a fight he got into as a ten-year old, even though an investigation into

his family revealed that he was maladjusted, troubled, and possibly abused.     Although he only received probation, it was the first of many aggressively harsh approaches to Terry's upbringing.

The State also elected to pursue criminal charges against the 15-year-old Terry when he walked away from the juvenile court.    Although his flight from the courthouse was technically an escape under Alabama law, a child who was not in the State's dependency system would probably not be exposed to such a charge for two reasons.  First, a child living with his family typically would not face criminal charges for running away from home or being difficult, but that is precisely what happened here.  Terry had been referred to the juvenile court with a recommendation of Youth Services detention because he had run away from his foster placement and was hard to manage.  Second, most children are disciplined by their parents in the home, but Terry was in court (and thus in a position where he could commit an escape) in

the first place because his group home placement was unable to cope with him, that is, could not "parent" him. When Terry acted out, DHR brought him before a judge. In effect, the judge was acting as Terry's parent to the extent he was deciding Terry's punishment for misbehaving in the group home placement. A child's flight from a parent does not generally constitute the felony of escape; in Terry's case, however, his flight was treated as a felony because he had been dragged before a judge for non-criminal conduct in his group home placement. Thus, on two levels, Terry was in a situation that a child not in DHR custody would never face.

Finally, when Terry aged out of the foster-care system at age 18, he was left to his own devices and allowed to return to his familial neighborhood, even though he had been removed from his family home because of the prevalence of drugs. There is no indication that he had any support services available to him or any independent-living transition plan. Thus, the State can

27

hardly have been surprised that the 18-year-old Terry, who had not been equipped with many useful skills during the eight years the State oversaw his upbringing, turned to the illicit drug market for income.  Nonetheless, he received a very harsh sentence for the drug offense (15 years' imprisonment, with a requirement to serve two before being eligible for parole), which was his first adult criminal offense, despite the fact that the Alabama criminal statutes allow for a mandatory minimum of three years only if the defendant had 28 grams or more of cocaine.  See 1975 Ala. Code § 13A-12-231(2)(a).  Thus, for 1/200 of the amount of drugs, he received 2/3 of the sentence contemplated as punishment under that statute.

This is the most troubling aspect of the State's actions toward Terry: The State abandoned him to situations where he was destined to fail and then saddled him with a criminal history by deciding to criminalize the conduct of a troubled child.  While parenting is not an easy task, we as a society do not allow parents to

abdicate that responsibility simply because it is hard.[12]
But that is precisely what the State did with Terry.  He
was hard to manage, so they moved him from placement to
placement and then washed their hands of him as soon as
he turned 18 by abandoning him.

Simply put, Terry is a creature of the State of
Alabama.  At the age of ten, he was taken into the
custody of the State on the promise that the State would
and could provide him with, not only more than his
parents and guardians had, but adequate care.  In
undertaking to care for Terry, the State failed him.
Moreover, by abandoning him on his eighteenth birthday to
a crime-riddled neighborhood with no means for support,
the State also failed society.

Terry's situation calls to mind Mary Shelley's
Frankenstein.  In one of the most philosophically
troubling exchanges in literature, the creature complains

---

12. For example, most states have laws that punish
abandonment or neglect of children and require absent
parents to pay child support.

to Dr. Frankenstein that he is evil only because Dr. Frankenstein took it upon himself to make the creature, and then abandoned him.  In other words, having made the creature, Dr. Frankenstein's great, and unforgivable, evil was then to have abandoned him.  In truth, Dr. Frankenstein was more evil than the creature: Dr. Frankenstein wronged not only society by creating the creature and then allowing it to roam without supervision and do harm; but Dr. Frankenstein also wronged the creature for allowing it to become evil when he should have nurtured and provided for it.

In some respects, the State of Alabama here is like Dr. Frankenstein.  It helped shape Terry by failing to provide adequately for him when it undertook to raise him; then, having failed, it simply abandoned him when he aged out of the foster-care system.  When he predictably engaged in criminal conduct, it imposed an extremely harsh sentence relative to the statutory scheme, perhaps

hoping that by locking him away it might somehow hide or make up for its failings.

But the State may be worse than Dr. Frankenstein because it saddled Terry with criminal-history points, by criminalizing his conduct and imposing inexplicably harsh punishments, that are now coming back to haunt him. Unfortunately, just as Terry made choices in his life that brought him to the place he is today, the State's repeated failure to live up to its promise to provide him a better life also contributed to his being here and facing such a long sentence.  This case therefore differs considerably from that of a defendant who merely had a difficult upbringing and lacked guidance as a youth, see U.S.S.G. § 5A1.12.  A variance may not be warranted simply because Terry had a difficult childhood or because his background somehow 'caused' the instant misconduct; the variance is warranted here because, during that difficult upbringing the State, acting as his parent, saddled him with criminal-history points by responding to

his conduct with criminal sanctions rather than parental care.

Of course, Terry's situation is but one sad story against a background of bleak statistics about young men who age out of foster care. It is estimated that 38 % of youths who age out of the foster-care system are emotionally disturbed; 25 % are involved in the criminal justice system; 50 % have been arrested at one time; less than 50 % have graduated from high school; less than 40 % are continuously employed; and the average weekly salary for those who do remain employed is $205 (less than $11,000 annually). Richard Wertheimer, <u>Youth Who "Age Out" of Foster Care: Troubled Lives, Troubling Prospects</u>, CHILD TRENDS RESEARCH BRIEF, at 5 (December 2002), available at   <u>http://www.childtrends.org/Files/FosterCareRB.pdf</u>; Wald & Martinez, <u>supra</u>, at 3. Thus, Terry's troubled early adulthood is exactly what one might expect given the circumstances he faced growing up. <u>See</u> Wald & Martinez, <u>supra</u>, at 3. Yet, in spite of this knowledge,

the State never made serious efforts to address Terry's needs and reacted to his predictable problems with severe criminal sanctions.

This court is not imposing a variance because the State failed to address Terry's underlying needs; many children, both in state custody and in parental custody, have this problem.   Rather, the court is imposing a variance here because the State went a step further and criminalized his conduct as it failed to meet his needs. After almost 12 years in the custody of the State of Alabama, Terry failed to obtain a high school education, was never allowed to find a positive adult role model, was denied a stable environment, and was repeatedly thrown into the criminal justice system when he failed to adjust.   And here he now stands before this court for sentencing, with a high criminal-history score that is directly traceable to decisions made by his "parent," the State of Alabama, to criminalize his conduct.

33

## C. Need for the Sentence Imposed

The crux of the sentencing analysis in this case is this: The sentence should be sufficient, but not greater than necessary, to reflect the seriousness of the offense, promote respect for the law, and provide just punishment (retribution); afford adequate deterrence to criminal conduct of others (deterrence); protect the public from further crimes by the defendant (incapacitation); and provide the defendant with needed educational or vocational training, medical care, or other correctional treatment (rehabilitation). 18 U.S.C. § 3553(a).

Retribution. The challenge here is figuring out how to punish Terry when he is the product of the State's dependency and criminal-justice systems. Imposing the full brunt of the punishment upon him is inconsistent with the concept of "just punishment." Part of the reason that his Guideline sentence is so long is that his "parent" (the State) failed to raise him, reacted to his

34

childhood problems with criminal charges, and then
abandoned him on his eighteenth birthday.  In some
respect, imposing the Guideline sentence would condone
and compound this deplorable conduct.

Deterrence.  A lengthy prison sentence will serve as
adequate warning to other potential felons.  A 60-month
sentence, which is one half of the statutory maximum for
a felon-in-possession conviction, certainly will have a
deterrent effect upon other offenders.  To the extent
potential violent felons are able to keep track of the
specific sentences received by others, they are not
likely to decide to engage in misconduct because Terry
received a five-year sentence instead of a seven-year
sentence.  This is particularly so because the length of
any given sentence is affected by the criminal-history
score of the particular defendant.

Incapacitation.  Incapacitation is an important
consideration in this case.  Within two months of aging
out of the foster-care system, Terry was arrested for

35

dealing drugs.[13]  Within two weeks of being released from his prison sentence for that offense, Terry committed the instant offense and allegedly robbed a woman at knife-point.  This demonstrates that Terry is likely to re-offend when released from custody and that his criminal conduct may continue to escalate in violence unless he achieves some measure of stability, develops a sense of purpose, and learns the basic skills necessary to connect with the job market.

Rehabilitation.  Thus, Terry needs rehabilitation, in the most complete sense.  He appears to function at an eighth-grade level.  He has a long history of using marijuana to cope with his sense of anxiety.[14]  Though he appears to have a carpentry certificate, he has a limited education and few job skills.  His involvement in the

---

13. As noted, this outcome was hardly surprising.

14. Though Dr. Boyer's mental health report stated that Terry does not appear to have mental health disorders, his statement that he relied on marijuana to cope with the overwhelming sense of stress does raise some concerns about his mental health.

36

State's criminal-justice and dependency systems also appears to have impeded his social adjustment and personal development.  Addressing these problems is no small task--as the court noted, it is "complete" rehabilitation.   Indeed, the court wonders if the criminal-justice system, which has moved more and more toward a retributive, as opposed to a rehabilitative, approach is up to the task.

However, the court is confident that Terry himself is up to the task because many people who know him much better than this court have agreed that he can succeed. One of his former foster parents stated that he is "savable."  Dr. Boyer offered the opinion that he can and will prosper if placed in a structured environment where he can set and attain goals, particularly if he can find a positive male role model.   The record reflects that when Terry settles into a stable environment, he has done quite well.   His problems have arisen when his environment changes: for example, the drug conviction two

37

months after returning to the streets of Clanton; the
instant felon-in-possession conviction two weeks after
being released from prison; and behavioral problems at
school and at home within one month of changing foster
placements in 2000.  Because Terry can be rehabilitated,
the need for incapacitation is offset to some degree.
However, when he is released from prison on supervised
release, he will need to be especially supported during
his transition.

    Conclusion.  A 60-month sentence properly balances
these sentencing considerations in light of Terry's
history, his conduct, and the sentences available.  The
court is especially troubled by the harsh sentences Terry
received from the State of Alabama, his "parent," in 2000
and in 2002, which together added five points to his
criminal-history score and made the three other criminal-
history points possible.

    However, the decisive factor is that the State's
failure is not complete, and Terry has a real hope for

rehabilitation.  The court hopes that his state sentence, along with the three years in the federal system, where he will have access to educational and vocational training and mental health and drug treatment, will prepare him to succeed when he is released to a strict regimen on supervised release for three years (the maximum allowed) and provided support services to help him acclimate to independent living.

### D. Avoiding Unwarranted Sentence Disparities

The final question is how this sentence fits into the larger federal criminal justice system, which imposes sentences on thousands of defendants each year.  This § 3553(a) factor ensures that defendants with similar records who have been found guilty of similar conduct receive similar sentences.  Indeed, the primary impetus behind the creation of the Guidelines was to counteract what was a seemingly arbitrary and unfair system of sentencing, in which two defendants with similar criminal

39

histories who were convicted of similar crimes could receive drastically different sentences. <u>Booker</u>, 543 U.S. at ___, 125 S. Ct. at 759.

Section 3553(a) frames the question as whether the sentence disparity is "unwarranted." 18 U.S.C. § 3553(a)(6). Because Terry's Guideline sentence does not take into account the role the State played in his upbringing or the way the State's actions generated his criminal history and because his opportunity for rehabilitation is unusual, whatever disparity might arise from a 60-month sentence is warranted.

. . .

For the foregoing reasons, the court sentenced Terry to a period of confinement of 60 months, with 36 months to run consecutive to any state sentence that he may serve for crimes arising from this conduct and the remainder to run concurrent to any such state sentence, followed by three years of supervised release.

DONE, this the 14th day of April, 2006.

40

_____/s/ Myron H. Thompson_____
**UNITED STATES DISTRICT JUDGE**